Anita Nye ("the mother") and Paul L. Nye ("the father") were married on August 7, 1993. One child, a son, was born of the parties' marriage. The mother's *Page 1148 
daughter from her previous marriage, who was 10 years old at the time of the divorce proceedings, had resided with the parties during their marriage. Although the parties separated on June 8, 1999, the father did not leave the marital home until the mother had requested pendente lite relief, and the trial court had entered a temporary order on November 30, 1999. On two other occasions before the mother filed this present action, the parties had separated, with the wife filing a divorce complaint.
The mother filed her divorce complaint in this case on August 3, 1999, alleging incompatibility of temperament. The father answered the complaint and filed a counterclaim for a divorce, on August 18, 1999, requesting custody of the minor son, child support, a property division, and an attorney fee. The mother, after retaining new counsel, filed an answer and an amended complaint on September 1, 1999. The mother filed a motion for pendente lite relief on October 22, 1999, alleging that the father had committed violence on her person and that she feared future violence. In her application for pendente lite relief, the mother requested that the father be ordered to leave the marital home and that she be awarded temporary custody of the minor child. The father responded to the mother's motion by denying her allegations and requesting temporary custody. The trial court conducted a pendente lite hearing and made no findings concerning the mother's allegations of domestic violence. Following that hearing, on November 30, 1999, the court ordered the parties to exchange custody of the child on a weekly basis; neither party was ordered to pay child support.
Following an ore tenus proceeding, the trial court entered a judgment on February 10, 2000, divorcing the parties, dividing the marital property, and awarding the parties joint legal custody of the minor child, with primary physical custody in the father. The trial court awarded the mother reasonable visitation rights, ordered the mother to pay child support of $94.00 per week, and ordered the father to maintain health insurance for the minor child.
On February 29, 2000, the mother filed a postjudgment motion; the trial court denied that motion on March 23, 2000. The mother appeals the custody determination, arguing that the trial court failed to consider or to apply the provisions of the Custody and Domestic or Family Abuse Act, as codified at Ala. Code 1975, §§ 30-3-130 through 30-3-136. Because we reverse and remand for the trial court to apply the provisions of the "Custody and Domestic or Family Abuse Act," we do not reach the other issues the mother raises on appeal.
In cases where the evidence is presented ore tenus, our standard of review is very limited. A trial court's custody determination is given a presumption of correctness on appeal and will not be reversed unless it is so unsupported by the evidence that it is plainly and palpably wrong, or the trial court has abused its discretion. McGough v. McGough,710 So.2d 452, 453-44 (Ala.Civ.App. 1997) (citing Phillips v. Phillips,622 So.2d 410, 412 (Ala.Civ.App. 1993)). This court has stated:
 "`In an action between parents seeking an initial award of custody, the parties stand on equal footing and no presumption inures to either parent. The trial court's overriding consideration is the children's best interest and welfare. The factors that enter into the court's custody determination include the child's age and sex and each parent's ability to provide for the child's educational, material, moral, and social needs. Likewise, it is proper for the court to consider the *Page 1149 
"characteristics of those seeking custody, including age, character, stability, mental and physical health . . . [and] the interpersonal relationship between each child and each parent."'"
Smith v. Smith, 727 So.2d 113, 114 (Ala.Civ.App. 1998) (citations omitted).
This court has held that an exception to the "equal-footing" principle applies where domestic or family violence has occurred. M.J.Y. v. J.S.Y.,758 So.2d 571 (Ala.Civ.App. 1999). In 1995, the Legislature passed the "Custody and Domestic or Family Abuse Act," § 30-3-131, Ala. Code 1975, which provides that joint custody is not appropriate in situations involving domestic or family violence. See E.M.C. v. K.C.Y.,735 So.2d 1225 (Ala.Civ.App. 1999). In particular, § 30-3-131, Ala. Code 1975, provides:
 "In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence. Notwithstanding the provisions regarding rebuttable presumption, the judge must also take into account what, if any, impact the domestic violence had on the child."
See also Jackson v. Jackson, 709 So.2d 46 (Ala.Civ.App. 1997) (this court reversed the trial court's joint-custody order because the trial court failed to consider the allegations of domestic violence committed by the father). When child custody is at issue between parents and when the possibility of domestic or family abuse exists, the trial court is required to apply the provisions of the "Custody and Domestic or Family Abuse Act." Davis v. Davis, 743 So.2d 486 (Ala.Civ.App. 1999); Harbertv. Harbert, 721 So.2d 224 (Ala.Civ.App. 1998).
The mother contends that it is in the child's best interest that she, and not the father, be awarded custody. The record discloses that the mother is 38 years old, is a high-school graduate, and is employed with Martin Industries as a production scheduler, earning a monthly gross income of $2,666. At the time of the divorce, the mother had recently changed jobs. She formerly worked as an accounting manager; that job had required her to work on weekends and late in the evening. The record indicates that her present job does not require her to work late or on weekends. The mother currently works from approximately 7:00 a.m. to 5:30 p.m. During the marriage, the mother took the children to school or to a babysitter in the morning, while the father often picked the children up from school when the mother worked late. While the mother is at work, and when the children are not in school, a babysitter stays with the children. The mother testified that she did most of the housework, parenting, and cooking; however, the father disputed that testimony.
The father is 42 years old, and he is also currently employed by Martin Industries, earning an hourly wage of $13.50; however, the record indicates some dispute about the father's monthly income when his overtime wages are considered. At the time of trial, the father was paying for the child's health insurance. The father often assists with his son's baths, with cooking meals for the family, with housework, and with putting the children to bed. The record indicates that the father's parents also assist with the care of the children.
At trial, the mother emphasized the father's alleged domestic abuse and threatening behavior. On appeal, the mother argues that two violent incidents had occurred, one where the father pushed her *Page 1150 
up against a cabinet and another where he pushed her onto the bed one morning following her shower, and that those incidents support her position that the trial court erred by awarding primary physical custody of their son to the father. The mother testified, on direct examination, in relevant part,
 "Q: Has he ever in the six years — well, let's go back to the last time. Just since the last time that you filed for divorce and then dismissed it, has there been any act of violence or threat of violence towards you made by Paul?
 "A: Whenever we went through this last time, he pushed me up against the cabinet. We were kind of screaming at one another and he has the habit of getting right up in my face and I just went to push him back to get him out of my face.
"Q: Have you ever had him arrested?
"A: No, sir.
 "Q: Have you ever had to go to the emergency room or a physician or any other medical provider because of the injuries suffered by Paul?
"A: No, sir.
 "Q: I want to ask you specifically about an incident that occurred in October of this year when you were getting ready for work and you came out of the shower. Do you remember that incident?
"A: Yes, sir.
"Q: Tell us what happened.
 "A: Paul always went to work real early, got up and opened the plant up. I was used to — the kids were always still asleep and I was used to going out of the bathroom and going [into] in the bedroom and getting my clothes out and putting them on. And since he and I have been going through all this I had always tried to make sure I wrapped up in a towel. Well, that morning I was thinking about something else or whatever and I didn't. Well, he was laying in the bed and I don't remember for what reason, he didn't go to work early or — I don't even remember why, he was just still there. And he got up out of the bed and grabbed me from behind and he accused me of doing that on purpose.
"Q: Accused [you] of doing what on purpose?
 "A: I guess, coming in there naked in front of him. And he threw me down on the bed and then he and I got into it and I told him, I said, `You get off me and you leave me alone.' And I don't remember exactly what was said, but we just had words about, you leave me alone and I told him, I said, `You just go ahead and do whatever. Just leave me alone.'
"Q: Did he hurt you?
"A: No.
"Q: Did he do anything to you?
"A: No."
On cross-examination, the father's attorney questioned the mother about her previous testimony surrounding the October incident:
 "Q: And you brought up to the court earlier about being bothered the time when he observed you without clothes on and he grabbed you?
"A: Yes ma'am.
 "Q: Did you really feel threatened at that time and bothered by that?
"A: At that moment, yes ma'am, I sure did.
 "Q: Paul's never attacked you or hurt you in any other way prior — during this marriage; has he?
"A: I've never denied him anything before."
Although the father did not dispute the mother's testimony regarding the above-mentioned *Page 1151 
incidents, he presented several character witnesses, primarily church members and neighbors, who testified that he appeared to love and care for his son and that he did not have a violent nature. The father's therapist testified that the father is unlikely to be violent toward the child and that he had no concerns for the son if the father were awarded custody. It is clear from the record that the incidents were directed at the mother, not at the child. However, we are unable to determine from the record whether the court properly considered the allegations of domestic violence committed by the father.
Based upon the trial court's finding that "both parents are fit and proper to have custody of the parties' minor child," it appears that the trial court did not consider § 30-3-131, Ala. Code 1975. In cases where custody is in dispute and allegations of domestic violence exist, the trial court must make a determination whether domestic violence or abuse has occurred. If the trial court finds that domestic violence or abuse has occurred, then that finding creates a rebuttable presumption that the perpetrator of the abuse or violence must refute before the trial court can award joint custody. § 30-3-131, Ala. Code 1975; Jackson v. Jackson, 709 So.2d 46 (Ala.Civ.App. 1997). The parties in this case disputed custody. Furthermore, the possibility of domestic or family abuse exists in this case. See Davis v. Davis, 743 So.2d 486
(Ala.Civ.App. 1999); Harbert v. Harbert, 721 So.2d 224
(Ala.Civ.App. 1998). However, the trial court, when awarding the parties joint custody of the child, did not make a finding that domestic abuse either had or had not occurred. Therefore, we reverse the judgment awarding the parties joint legal custody and remand the case for the trial court to determine whether domestic abuse occurred in this case and, if the trial court determines that the father did commit domestic abuse, whether the father rebutted the presumption established by the "Custody and Domestic or Family Abuse Act."
REVERSED AND REMANDED.
Yates, Monroe, and Crawley, JJ., concur.
Robertson, P.J., concurs in the result.