PER CURIAM.
R.D.R. ("the father") and C.R.P. ("the mother") were never married to one another, but they are the parents of two daughters-M.R.S. and J.N.S. ("the children"), born on September 14, 2005, and on July 29, 2006, respectively. The family was living in Texas in 2008 when the father enlisted in the United States Army. The parents subsequently parted on bad terms.[1] The mother and the children moved to Alabama. On November 3, 2009, the Madison Juvenile Court ("the juvenile court") adjudicated the father as the father of the children and, among other things, *876 awarded the parents, per their agreement, joint legal custody of the children. Due in part to the parents' anticipation that the father would be deployed, the custody order provided that the children would live with the mother during the school year, with the possibility of living with the father in the summer and on alternating weekends; the father was also ordered to pay child support. In 2010 the father married A.R. ("the stepmother"), and, that same year, the mother relocated to Georgia with the children. The father was stationed in Kuwait in July 2011 when J.N.S. was diagnosed with cancer, received treatment, and recovered by February 2012. In the father's absence, the stepmother, who was apparently living in Alabama, and the mother cooperated to support J.N.S. during her illness. In 2011 the mother married a man who was not referred to by name in the record. She divorced that man in 2013. In 2014, the father, who was no longer on active military duty, accepted a job in Texas, and the mother married R.P. ("the stepfather"). At some point not disclosed in the record, the father moved back to Alabama.
On December 12, 2014, the mother and the stepfather engaged in an act of domestic violence in the presence of the children ("the incident"). Following the incident, the mother entered into the first of two safety plans initiated by the Georgia Division of Family and Child Services ("GDFCS"). The mother agreed, among other things, that the children would live with the father in Alabama, that the stepfather would have no contact with the children, and that the mother would have supervised visitation with the children.[2] On January 13, 2015, the father filed in the juvenile court a modification petition in which he requested an award of temporary and permanent sole physical custody of the children, an order suspending his child-support obligation, and an order requiring the mother to pay child support.
On January 26, 2015, the juvenile court held a pendente lite hearing at which the mother failed to appear. On March 27, 2015, the juvenile court entered an order, awarding the father pendente lite sole physical custody of the children subject to the mother's right to visitation. The children began living in a three-bedroom residence with the father, the stepmother, their child, and the stepmother's son from another relationship. On April 17, 2015, the mother filed an answer and a counterclaim in which she requested, among other things, a dismissal of the father's modification petition and an award of pendente lite and permanent "full physical and legal custody."
In the meantime, the father had filed a motion seeking an order requesting certain documentation from GDFCS regarding its investigation into the incident, which the juvenile court granted on March 18, 2015. GDFCS responded with a motion to quash or, in the alternative, for a protective order because, it alleged, the requested information was confidential. The juvenile court denied the motion to quash and granted the motion for a protective order; the juvenile court determined that it would review the documents and designate which, if any, documents or portions of documents were relevant to the issues raised. The father also filed a motion seeking an order allowing Jamila Gilcrest,[3] a GDFCS employee, to testify *877 telephonically, which the juvenile court denied.[4]
A three-day modification hearing began on June 24, 2015; however, at the close of testimony on that day, the father requested a continuance during which he intended to secure an affidavit of authenticity regarding the GDFCS documents and to file a subpoena requiring Gilcrest to appear at the modification hearing. The juvenile court granted the continuance and issued the subpoena. The modification hearing resumed on July 30, 2015, and it concluded on July 31, 2015. Gilcrest did not appear.
On August 31, 2015, the juvenile court entered a modification judgment in which it determined in paragraph one that the best interests of the children[5] was served by an award to the mother of "primary" physical custody; however, paragraph two reads:
"2. The parties shall continue to share joint legal custody of the minor children.... The Mother ... shall have sole physical custody of the minor children, subject to the Father's reasonable right of secondary custody as outlined in '150 Mile Custody Schedule' attached hereto as Exhibit 'A.' The pendente lite order awarding custody of the children to the Father is dissolved, and physical custody of the children shall resume with the Mother."[6]
(Emphasis added.)
The juvenile court specifically noted in its judgment that, in making its decision to award the mother sole physical custody, it had not "take[n] further evidence" regarding whether the children were safe in the presence of the stepfather because the mother had stated her intention to seek a divorce from the stepfather, and the juvenile court specifically prohibited all contact between the children and the stepfather.
On September 14, 2015, the father filed a postjudgment motion. The father filed a notice of appeal on September 21, 2015, which was before the postjudgment motion had been ruled upon. As provided by Rule 4(a)(4), Ala. R.App. P., the appeal was held in abeyance until the juvenile court denied the father's postjudgment motion on September 22, 2015. The father seeks our review of whether the juvenile court erred by refusing to award sole physical custody of the children to him, by failing to apply the presumptions provided by § 30-3-131, Ala.Code 1975, and by refusing to allow him to admit or use a certain exhibit.
"On appellate review of custody matters, [the appellate] court is limited when the evidence was presented ore tenus, and, in such circumstances, a trial court's determination will not be disturbed 'absent *878 an abuse of discretion or where it is shown to be plainly and palpably wrong.' Alexander v. Alexander, 625 So.2d 433, 434 (Ala.Civ.App.1993) (citing Benton v. Benton, [520 So.2d 534 (Ala.Civ.App.1988) ] ). As the Alabama Supreme Court highlighted in [ Ex parte] Patronas, [693 So.2d 473 (Ala.1997) ], ' "[T]he trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody." ' Patronas, 693 So.2d at 474 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996) ). Thus, appellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support the trial court's judgment. See Patronas, 693 So.2d at 475.
" 'However, even under the ore tenus rule, "[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed." ' B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979) )."
Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala.Civ.App.2007). Moreover, the ore tenus rule does not apply to a trial court's legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala.2000). Legal conclusions are subject to de novo review. Shealy v. Golden, 897 So.2d 268, 271 (Ala.2004).
The father, who had lived in Alabama, Texas, and Kuwait, testified that he had never exercised all the visitation to which he was entitled. He said that, instead of exercising visitation on alternating weekends, he had routinely exercised visitation one weekend per month or less. The following exchange took place between the father and the mother's attorney:
"A: [Visitation] was during-I would have them during the summer. I was supposed to have them the whole summer they are out, but technically, if we didn't agree, I was [June] 15 through [July] 15.
"Q: That's it?
"A: And we would swap holidays. Just the regular out-of-state visitation schedule for Madison County.
"Q: So you didn't have all alternating weekends?
"A: No, sir.
"Q: So roughly for the last six years your visitation schedule with the girls has been one month in the summer and alternating holidays; is that right?
"A: No, sir. It has been the whole summer, but technically, if we did not agree, it was June 15 through July 15. The only reason I bring that up is because it has been used against me, but so far I have seen them all summer-other than last summer."
The mother testified that the children had spent most of "last summer" with her so that they could take part in her wedding.
The father testified that he had been arrested while he was living in Texas in 2014 for leading police officers on a high speed chase, which is a felony. He said that he was on probation until he completed community service and paid a $1,200 fine. He also admitted that he had a history of substance abuse. He said that he had sold and abused pain medication when he was between 16 and 18 years old and that he had abused marijuana, opiates, and cocaine in the past. He said that he had attended a drug-detoxification program for "huffing" paint in 2007; however, he said that he had not intentionally inhaled paint fumes and that the whole situation *879 had been "ridiculous." The father testified that his mother-in-law had given him one prescription "pain pill" on one occasion within a year of the modification hearing while he was at her house because he had had either a headache or an earache. He testified that he no longer abused, or even consumed, alcohol or illegal drugs. He and the mother each submitted to a drug test on the first day of the hearing; both tests were negative. The father said that had known the mother since she was 14 years old and that she had never abused substances.
The mother testified that GDFCS became involved with the family on November 16, 2014, when the incident occurred. Testimony indicated that the stepfather had thrown a metal shelf at the mother, had hit her on the leg, had "spanked" M.R.S. after she had thrown a toy at him, and, as the mother was fleeing the residence with the children, had destroyed the mother's cellular telephone and had broken a chair by throwing it at the mother's automobile. The stepfather was arrested and jailed following the incident. The stepfather said that, as a result of the incident, he had pleaded guilty to, among other charges, domestic violence to "get it out of the way"; however, he did not believe that he had abused anyone. Although the stepfather admitted that he had also been arrested for driving under the influence, for a probation violation, and for "bar fights," he testified that the incident was the only time he had committed an act of domestic violence. According to the mother, the incident was not the first physical altercation that the couple had had but that it was the first such occurrence in the presence of the children. The mother admitted that she had violated the first safety plan by allowing the children to be in the presence of the stepfather because, she said, he was not a threat to the children. The stepfather confirmed that they had knowingly violated the safety plan.
After the incident occurred, the mother had been diagnosed as suffering from "emotional issues" and "extreme separation anxiety." The mother testified that she did not take the recommended "anxiety medication." She said that she had lived in three different locations since she left the residence she had shared with the stepfather, that she had been evicted from one of those places, and that she, along with the children, had been evicted at least three other times in the past for failure to pay rent. The stepfather testified that the family had been evicted four times in the past two years. The father said that the mother had not made him aware of the evictions or that the children's address had changed multiple times. The mother testified that, at the time of the modification hearing, she had leased an apartment that she could afford.
On the first day of the modification hearing, the mother testified that she wanted to remain married to the stepfather. The stepfather said that they were friends but that he did not intend to "resume" the marriage or to live with the mother; however, he also said that the mother was his best friend and that, if they got "help," they might live together. When asked if she would allow the stepfather to be around the children if their custody was awarded to her, the mother answered: "Yes." The father said that the mother had telephoned the children every two or three days while they were in his custody pendente lite, that the children and the mother had spoken on speakerphone, and that he had heard the stepfather in the background of nearly every telephone call.
On the second day of the modification hearing, the father introduced evidence *880 demonstrating that, in the month between the first and second days of the modification hearing, the mother had filed a motion seeking a temporary protective order against the stepfather in a Georgia court and that the mother had sought and received a dismissal of that motion within a few days of her filing. Julie Luciano, an employee of GDFCS, testified that the mother had "done this before," that the mother had displayed an inability to "make her mind up about whether she wants to stay away from [the stepfather] or not," and that GDFCS "would have to open up a new case in the State of Georgia" if the juvenile court awarded the children's custody to the mother, regardless of whether the mother was married to or divorced from the stepfather.
On the third day of the modification hearing, the mother testified that her marriage to the stepfather was over. She said that she had filed for a protective order only because a court employee had advised her that, if she did so, her fees for filing a divorce action would be waived. The following colloquy occurred between the mother's attorney and the mother:
"Q. Did you feel like you were being required to choose between your husband and your daughters?
"A. Of course.
"Q. Do you consider [the stepfather] to be a threat?
"A. I don't consider him to be a threat, no.
"Q. But you don't deny that he has hurt you?
"A. Oh, I don't deny that that incident happened.
"Q. If this Court decides to give you the girls back, do you intend on violating this Court's orders?
"A. No, sir.
"Q. So if the condition is that [the stepfather] is not to be around at all-you or the girls-that won't be an issue?
"A. No, sir. I have-this has been a huge wake-up call for me."
The testimony regarding the children's medical and insurance needs is confusing.[7] The children appear to have been uninsured at times and, at other times, insured by the father through his employer, the stepfather through his employer, and through Medicaid when the mother was single. The father said that the children were in need of dental and orthodontic care but that the mother had failed to attend to those needs. The father, who had had pendente lite custody of the children for three months, said that he had scheduled dental appointments and that he needed to have the children under his employer's insurance coverage so that he could use the dentist he preferred.
Witnesses also presented testimony regarding initial and follow-up cancer-treatment appointments for J.N.S. The father had accompanied J.N.S. to only two appointments-one in 2011 and one in 2015. The testimony presented regarding the appointment in 2015, though unclear, tends to demonstrate that the mother, the father, and the stepmother accompanied J.N.S. and that, at that appointment, the father learned that J.N.S. had missed some medical appointments in 2012, 2013, and 2014. The mother admitted that she had missed medical appointments when J.N.S. did not have insurance.
*881 The stepmother had attended more medical appointments than had father due only in part to his military deployment. For example, the father said that the stepmother had accompanied J.N.S. to her most recent appointment with an ultrasound technician while he had stayed at home with the other three children. The stepmother testified that she, and not the father, was in the process of "chasing down medical [and dental] records." The father said that the stepmother "worked in the medical field" and that she "figured out" J.N.S.'s appointments. The father said that, because of his deployment, the stepmother "has been very much involved, if not more involved than the mother." Likewise, the mother testified that, at times, the stepfather had accompanied J.N.S. to appointments when the mother was working.
The father said that the mother loves the children and that, despite how it might appear, he and the mother were good friends who communicated easily; however, the father testified that he did not trust the mother's judgment. He testified that he was concerned about the children living with the stepfather based on his history of anger issues and bar fights and that he was concerned about the children living with the mother based on her violation of the safety plan, her history of evictions, and, he alleged, her inability to attend to the children's medical and other needs.
First, we consider the father's argument that the juvenile court erred by declining to award sole physical custody of the children to him. Our supreme court has stated that an appellate court's review of a factual issue in a custody-modification action is limited and that this court may not substitute its judgment for that of the trial court or reweigh the evidence. Ex parte Patronas, 693 So.2d 473, 474-75 (Ala.1997). The presumption in favor of the trial court's judgment in a custody-modification action is based on the advantage that the trial judge has of seeing the parties and witnesses as they testify. Thus,
"[t]his case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody."
Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala.1996).
The juvenile court, "[a]fter careful consideration of the ore tenus testimony, observation of the parties, [and] assessment of the credibility of the witnesses," determined that a custody modification was in the best interests of the children. The juvenile court determined that the children had not "been a priority to the Father for a significant period of time prior to the events that led to the filing of the petition herein" because the father had never exercised all the visitation allowed by the November 3, 2009, joint-custody order. The juvenile court also determined that the father had "delegated the vast majority of the parenting to the step-mother." The juvenile court noted the father's "drug usage" and his being on probation for the felony committed in Texas. Although the father had also presented unfavorable evidence regarding the mother, we conclude that the evidence presented supports the juvenile court's modification judgment. A trial court's determination will not be disturbed "absent an abuse of discretion or where it is shown to be plainly and palpably wrong." Alexander v. Alexander, 625 So.2d 433, 434 (Ala.Civ.App.1993) (citing *882 Benton v. Benton, 520 So.2d 534 (Ala.Civ.App.1988) ).
Next, the father argues that the juvenile court erred by failing to specifically address and apply the presumptions provided by § 30-3-131, Ala.Code 1975, which provides, in its entirety:
"In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence. Notwithstanding the provisions regarding rebuttable presumption, the judge must also take into account what, if any, impact the domestic violence had on the child."
Contrary to the father's assertion, the juvenile court was not required to include a specific finding regarding domestic violence. Ex parte Fann, 810 So.2d 631, 638 (Ala.2001).[8] The juvenile court did not err by taking into account the father's testimony that "the counselor basically felt like everything was all right, and, you know, unless we started seeing any major issues, we were good to go." Because the father testified that the counselor had detected no detrimental impact, the father has not demonstrated that the juvenile court erred by failing to specifically address or properly apply § 30-3-131.
Finally, the father presents a two-part argument that the juvenile court erred in excluding a report compiled by GDFCS ("the report"). In Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala.2001), our supreme court explained:
" '[T]he trial court has great discretion in determining whether evidence, even evidence of minor probative value is relevant and whether it should be admitted or excluded.' Sweeney v. Purvi s, 665 So.2d 926, 930 (Ala.1995). When evidentiary rulings of the trial court are reviewed on appeal, 'rulings on the admissibility of evidence are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion.' Bama's Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998), citing Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165 (Ala.1991)."
Neither the report nor the affidavit of authenticity regarding the report is contained in the record on appeal.
"The propriety of the court's ruling in refusing to allow the introduction of these documents is not reviewable when the documents are not set out in the record. Neumiller v. Jenkins, 270 Ala. 231, 117 So.2d 402 [ (1960) ]; Sims v. Struthers, 267 Ala. 80, 100 So.2d 23 [ (1957) ]; Wesson v. Taylor, 240 Ala. 284, 198 So. 848 [ (1940) ]; Pearson v. Howe, 11 Ala. 370 [ (1847) ]."
Forest Inv. Corp. v. Commercial Credit Corp., 271 Ala. 8, 11, 122 So.2d 131, 134 (1960) ; see also Birmingham Slag Div. of Vulcan Materials Co. v. Chandler, 45 Ala.App. 406, 410, 231 So.2d 329, 332 (Civ.App.1970). Thus, we cannot review the father's first subargument that the juvenile court erred by depriving him the "right to introduce, admit, and cross-examine witnesses *883 concerning the [report] produced by [GDFCS] under seal to the Court."
The father continues his argument with his specific contention that he was improperly denied the ability to use statements allegedly contained in the report to impeach the testimony of the stepfather and the mother. The father does not point this court to any particular inconsistent statement. As this court has previously stated: "Let it be pointed out, that the alleged prior inconsistent written statement is not a part of the record and not properly before us. We have only counsel's statement to the court as to an alleged instrument in his custody, and that is far from clear." Birmingham Slag Div., 45 Ala.App. at 409-10, 231 So.2d at 331-32. In his appellate brief, the father generally argues:
"[T]he [mother] and [the stepfather] made conflicting statements to the Court and [GDFCS] concerning the nature of the domestic violence incident and what occurred that night, the occurrence of previous incidents of domestic violence, as well as the [mother]'s recount of her statements to [GDFCS] concerning the nature of the safety plan and her feelings about the [father] as a father."
At the modification hearing, the father provided one offer of proof.[9]
" 'The burden of establishing that an erroneous ruling was prejudicial is on the appellant.' Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991). A judgment will not be reversed for erroneous exclusion of evidence unless 'the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.' Rule 103(a)(2), Ala. R. Evid. 'An offer of proof customarily includes calling the court's attention to the expected answer and explaining the relevancy of that answer.' Committee Comments to Rule 103, Ala. R. Evid."
Crusoe v. Davis, 176 So.3d 1200, 1202 (Ala.2015).
After the mother testified that the incident was the only occurrence of domestic violence in the presence of the children, the father again offered the report into evidence, and the mother again objected. The father then sought to offer only one statement from the report, which, the father alleged, was the mother's admission to Gilcrest that more than one act of domestic violence had been committed in the presence of the children. The mother argued that that statement amounted to hearsay within hearsay. The father argued that he was entitled to use extrinsic evidence for the purpose of impeachment, see Rule 613(b), Ala. R. Evid. He noted that the report had been authenticated,[10] see Rule 902(11), Ala. R. Evid.; that the mother was a party, Rule 801(d)(2)(A), Ala. R. Evid.; and that the admission of the report or the alleged statement was necessary because Gilcrest had "refused to appear by subpoena." The juvenile court *884 concluded that the statement was inadmissible because Gilcrest was not available for cross-examination. The following colloquy occurred:
"[The father's attorney]: I would like to make an offer of proof.
"THE COURT: Okay.
"[The father's attorney]: The statement in [the report] states that [the mother] has admitted to multiple incidents of domestic violence in front of the children, and I would like that made as an offer of proof for the record, Your Honor.
"THE COURT: Okay. It is so made, and the objection is sustained."
Rule 613(b), Ala. R. Evid., provides that extrinsic evidence of a prior inconsistent statement by a witness is admissible when the witness has been confronted with the circumstances of the statement, can identify the statement, and is afforded an opportunity to admit or to deny having made it. In this case, the mother denied having made the alleged prior inconsistent statement. "[A] witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his [or her] own." United States v. Saget, 991 F.2d 702, 710 (11th Cir.1993). Gilcrest did not appear at the modification hearing, and the record does not demonstrate that the report, which allegedly contained the prior inconsistent statement, was properly authenticated. "Nothing in [ Rule 613 ] abrogates the requirement that if the witness denies having made the statement then any extrinsic evidence of the prior inconsistent statement must be properly authenticated." Advisory Committee's Notes to Rule 613, Ala. R. Evid.
Furthermore, for the failure to admit evidence of a prior inconsistent statement to be reversible error, "the error complained of [must have] probably injuriously affected [the] substantial rights of the parties." Rule 45, Ala. R.App. P.; Wallace v. Phenix City, 268 Ala. 413, 108 So.2d 173 (1959). In this case, the father has not shown probable injury. Therefore, had we determined that the alleged inconsistent statement had been improperly excluded, that error would not have warranted a reversal because, even if the juvenile court had doubted the mother's credibility regarding how many incidents of domestic violence the children had witnessed, the juvenile court had removed the obstacle to a modification of custody by expressly forbidding contact between the stepfather and the children.[11]
In conclusion, the father has failed to demonstrate that the juvenile court erred by refusing to award sole physical custody of the children to him or by failing to apply the presumptions provided by § 30-3-131, Ala.Code 1975. The propriety of the juvenile court's refusal to allow the introduction of the report is not reviewable because the report is not set out in the record. The juvenile court also did not err by refusing to admit evidence regarding the mother's alleged inconsistent statement.
*885 The judgment of the juvenile court is therefore affirmed.
AFFIRMED.
THOMPSON, P.J., and THOMAS, MOORE, and DONALDSON, JJ., concur.
PITTMAN, J., concurs in the result, without writing.

The father filed criminal charges against the mother for writing numerous checks from his banking account without his knowledge.

The second safety plan was necessary because the mother violated the first safety plan by allowing the stepfather to be in the presence of the children.

"Jamila" is also spelled "Jamela" in the record; "Gilcrest" is also spelled "Gilchrist" in the record.

The father has not raised the propriety of the denial of his motion as an issue on appeal. "The failure to raise an issue on appeal is the equivalent of waiving the issue." Ex parte Professional Bus. Owners Ass'n Workers' Comp. Fund, 867 So.2d 1099, 1101 (Ala.2003).

If neither parent has previously been awarded sole physical custody, then "the best interests of the child" standard applies. See Ex parte Couch, 521 So.2d 987, 989 (Ala.1988).

Section 30-3-151, Ala.Code 1975, does not provide for awards of "primary" or "secondary" custody. In this case the juvenile court awarded the parties joint legal custody as defined by § 30-3-151(2), and it awarded the mother sole physical custody as defined by § 30-3-151(5). It awarded the father visitation, not "secondary custody," based upon the distance between the parties' residences; the father's visitation included two weekends per month and specified holiday and vacation times.

The father's testimony is particularly difficult to follow. More than once, the juvenile-court judge made comments indicating that she was struggling to understand his testimony. For example, she said: "[The father's] testimony has been kind of confusing all afternoon. I have had a hard time following it."

The father relies heavily on Nye v. Nye, 785 So.2d 1147, 1151 (Ala.Civ.App.2000). This court relied on Nye in A.S. v. G.T., 794 So.2d 1167, 1169 (Ala.Civ.App.2001), for the proposition that a trial court is required to make an express finding as to whether domestic abuse occurred-a proposition that was overruled by our supreme court in Ex parte Fann. Therefore, the father's reliance on Nye is misplaced.

On the first day of the modification hearing, the father requested to make an offer of proof regarding the stepfather's allegedly inconsistent statements. The father's attorney said: "He has made these statements to [GDFCS]. He is making comments that he did not make these statements." Although we can discern that "these statements" likely refer to the item that the stepfather threw at the mother during the incident, the father's attorney never offered the substance of the statements allegedly made to GDFCS.

Rule 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." As already mentioned, the affidavit of authenticity is not included in the record on appeal.

We also note that the credibility of the mother and the stepfather was tested. For example, the mother first testified: "[The stepfather] and I got into a verbal argument that then turned to me being physical." Later she admitted that the stepfather had thrown an object at her and had hit her leg. The mother testified that it was unfair to characterize the stepfather's actions with her cellular telephone as destructive because, she said, he merely stepped on it. The stepfather testified that he had taken the mother's cellular telephone without her permission, that he had broken it, and that he pleaded guilty to criminal trespass as a result.