MOORE, Judge.
Jerome W. Hughes ("the father") appeals from a judgment of the Houston Circuit Court ("the trial court") entered in a contempt action filed against him by Valeriya M. Hughes ("the mother"). We affirm the judgment in part and reverse it in part.
Procedural History
The parties have previously appeared before this court. See Hughes v. Hughes, 218 So.3d 349 (Ala. Civ. App. 2016). In Hughes, this court recited the procedural history of the case as follows:
"The parties were divorced by a judgment entered by the trial court on August 25, 2014. The divorce judgment incorporated a settlement agreement entered between the parties, which provided, among other things, that the parties would share joint legal custody of the parties' child, that the mother would have 'primary physical custody'[1] of the parties' child, and that the father would have specified visitation. Additionally, the settlement agreement provided that the father would pay no child support but that he would be responsible for all costs associated with the child's private-school education. The settlement agreement further provided that each parent would give the other parent the right of first refusal if he or she anticipated the child being left with someone other than a parent for more than one night; that, if either parent would be traveling more than 100 miles from Dothan, he or she would give the *426 other parent 48 hours' notice of the travel plans; and that neither parent would have overnight guests of the opposite sex while exercising custody or visitation with the child.
"On October 14, 2014, the mother filed a petition for a rule nisi, asserting, among other things, that the father had told her that he intended to remove the child from the state and that he had violated the parties' settlement agreement by allowing his girlfriend to stay overnight while he was exercising his visitation with the child.[2] The mother sought an emergency hearing and an order directing the Sheriff of Houston County to assist her in obtaining custody of the child.
"On October 17, 2014, the father filed a response to the petition for a rule nisi as well as a petition for immediate temporary custody of the child. On that same date, the father filed with the trial court the affidavits of Doug Bauer, the headmaster at Ashford Academy, where the child was attending school, and Allyson Falgout, the child's teacher at Ashford Academy. On October 28, 2014, the father filed a motion for an instanter order of temporary custody and a request for an immediate hearing; the father attached to his motion the affidavit of Jennifer Campbell, a counselor at Ashford Academy. On that same date, the trial court entered an order setting a pendente lite hearing for November 10, 2014. The father filed a 'notice' to the trial court on October 30, 2014, informing the trial court that the child had been dismissed from Ashford Academy because of the behavior of the mother and her new husband; he attached to his notice a letter from Ashford Academy indicating that the child had been dismissed from the school. On November 3, 2014, the father filed a motion seeking the appointment of a guardian ad litem to represent the child's interests; the trial court granted that motion, noting that the father would bear all costs of the guardian ad litem.
"On November 9, 2014, one day before the scheduled pendente lite hearing, the father filed a notice of his intent to call witnesses at the pendente lite hearing and requested the presence of a court reporter at that hearing; the trial court entered an order denying that motion on November 10, 2014. On November 20, 2014, the trial court entered a pendente lite order, noting that all provisions in the settlement agreement of the parties that had been incorporated into the divorce judgment were to be followed unless modified by the November 20 order. The trial court also ordered the parties to complete parenting classes. It further ordered that the child was to be immediately re-enrolled at Ashford Academy, that the child was not to be withdrawn from Ashford Academy, and that the mother was to be respectful to all employees of Ashford Academy and was to follow the policies and procedures of the school at all times. The trial court ordered the mother not to direct and/or allow her new husband to speak on her behalf to employees at Ashford Academy regarding the child and further ordered the mother not to direct or influence the child to refer to the father as 'Jay,' noting that the father is the child's father and should be referred to as such. The trial court also ordered the parties 'not to influence the minor child in negative ways.'
"Also on November 20, 2014, the father filed a 'petition for modification in opposition to notice of change of residence.' The father asserted, among other things, that the mother had informed him that she intended to move with the child to Rhode Island on December 21, *427 2014. The father requested sole physical custody of the child or, in the alternative, an order preventing the mother from removing the child from Alabama. The father also filed that same day a petition for a rule nisi, asserting, among other things, that the mother had failed to give the father the right of first refusal to care for the child when the child was left with third parties for more than one night, that she had failed to give the father notice when she traveled more than 100 miles from Dothan, that she had deprived the father of his Wednesday night visitation with the child on October 22, 2014, that she had had guests of the opposite sex overnight during her custodial periods with the child, and that she had made disparaging comments about the father to the child, all in contravention of the parties' settlement agreement incorporated into the divorce judgment.
"On January 14, 2015, the mother filed a motion seeking an emergency hearing following the father's alleged arrest. The mother requested, among other things, that any visitation the child might have with the father be supervised. The mother filed an amended motion on that same date requesting the issuance of a protective order keeping the father away from the child; the mother asserted that the father would abscond with the child. On January 15, 2015, the trial court set the matter for a hearing on January 27, 2015. On February 18, 2015, the trial court entered a temporary order modifying the father's visitation with the child, instructing that, among other things, the father's parents were to supervise his visitation with the child and the child was not to be taken to the father's home at any time.
"On May 15, 2015, the father filed another 'petition for modification in opposition to notice of change of residence.' The father asserted in his petition that the mother informed him that she intended to move to Auburn with the child. The father sought sole physical custody of the child or, in the alternative, an order preventing the mother from removing the child from Houston County. The mother filed an answer to the father's petition on May 28, 2015. On that same date, the mother filed a counterclaim, seeking an award of attorney's fees from the father. The father later filed a response to the mother's counterclaim.
"On June 9, 2015, the father filed an instanter motion to vacate the trial court's February 18, 2015, temporary order and to reinstate the original custody/visitation order. Also on June 9, 2015, the trial court set the father's instanter motion for a hearing on June 30, 2015. On June 30, 2015, the trial court reset the hearing for July 28, 2015. The father filed a motion on June 29, 2015, seeking, among other things, a transfer of the child's custody to the father. At the July 28, 2015, hearing, as indicated in note 2, the trial court consolidated all the different actions involving the parties into a single action. At the outset of the July 28, 2015, hearing, the trial court stated that it intended to hear the father's petition to modify custody at that time. Both parties presented evidence, including testimony, at the hearing, at the end of which the trial court indicated that it was taking the case under advisement and entering an order for a 90-day trial period and noted that no final judgment was being entered in the case. On August 25, 2015, the trial court scheduled the case for a final hearing on November 3, 2015.
"A proposed temporary order was submitted to the trial court on September 17, 2015, and, on September 18, *428 2015, the trial court entered a 'temporary order' allowing the mother to move to Auburn with the child, allowing the father unsupervised visitation with the child, and modifying the father's visitation times with the child, among other things. Following the November 3, 2015, hearing, at which the trial court declined to allow the father to submit additional evidence, the trial court entered a judgment on November 10, 2015, awarding the parties joint legal custody of the child, with the mother having sole physical custody of the child. The trial court awarded the father visitation with the child three out of every four weekends per month beginning at 6:00 p.m. on Friday and ending at 6:00 p.m. on Sunday. The trial court further stated that 'the court having been informed the minor child is going to public school, the [father] is to pay child support in the amount of $350.00 per month' beginning December 1, 2015. The father filed his notice of appeal to this court on December 15, 2015.
"_______________
"[1] The parties and the trial court refer to the arrangement as 'primary physical custody.' Because that is an incorrect term unrecognized in Alabama law, we use the term 'sole physical custody' throughout this opinion to conform to the language used in § 30-3-150 et seq., Ala. Code 1975.
"[2] Some of the filings in the record on appeal were made in case number DR-13-900510, case number DR-13-900510.01, case number DR-13-900510.03, or case number DR-13-900510.04. At the July 28, 2015, hearing, the parties agreed to consolidate 'any and all matters' into case number DR-13-900510.02, and the trial court thereafter consolidated the cases. Because all the cases were consolidated by the trial court, in this opinion we do not identify in which case each document was filed in the trial court."
218 So.3d at 349-52. This court dismissed the father's appeal as having been taken from a nonfinal judgment because, we concluded, the trial court's November 10, 2015, judgment failed to adjudicate the petitions for a rule nisi filed by both parties, and, in addition, we noted that the trial court failed to address the mother's request for an award of attorney's fees. Id. at 352-53.
Following this court's dismissal of the appeal, the father filed, on September 14, 2016, a motion in the trial court requesting a hearing and for the trial court to address all claims presented or, in the alternative, to certify its November 10, 2015, judgment as final, pursuant to Rule 54(b), Ala. R. Civ. P. On February 22, 2017, the trial court entered a final judgment awarding the parties joint legal custody of the child; awarding the mother sole physical custody of the child, subject to the father's visitation three out of every four weekends per month; ordering the father to pay child support in the amount of $350 per month; and denying the petitions for a rule nisi filed by the parties, the mother's request for attorney's fees, and any remaining relief sought that was not addressed in that judgment. The father filed his notice of appeal to this court on March 17, 2017.
Facts
The father testified at the July 28, 2015, hearing that the mother made it difficult for him to visit with the child and that she withheld his visitations and failed to meet in the meeting places designated by the trial court. He testified that the mother is belligerent, aggressive, and uses profanity in front of the child and that she degrades and belittles the child. The father stated that the mother yelled and screamed at him and his parents as well. According to *429 the father, he and the mother agreed that, in lieu of child support, he would pay for the child's private schooling, and, he said, he had done that and would continue to do so because it is important to him that he provide the child with the best opportunity to get an education and become a successful adult. The father testified that he is financially stable, that he lives in a two-bedroom house in Cottonwood, and that the child would have his own bedroom in the father's house. He stated that he loves the child. According to the father, the mother has remarried. He stated that he did not want the child to move to Auburn with the mother because he would not get to see the child and because, he asserted, the mother is trying to alienate him from the child.
Allyson Falgout, the child's K-5 teacher at Ashford Academy for the 2014-2015 school year, testified that she had had a lot of interaction with the mother and the mother's husband. She testified that, on one occasion, the mother had exhibited behavior at the school that had required that the police be called. Falgout stated that she had observed the mother yelling at the child, which, she said, had caused the child to cry; she testified that, in her opinion, the mother's constant yelling was verbally abusive to the child. She also testified that she had had to contact the father to calm the child down when the child had had behavior issues. According to Falgout, the child had seemed less uptight when the father would take the child to school instead of the mother. She testified to an incident at which the mother and her husband had joined the child on a field trip and the mother's husband had drank alcohol during the trip; she testified that both she and other parents on the filed trip had felt the husband's actions were inappropriate. Falgout testified that she likes the mother, but not her husband. She stated that the mother's husband had telephoned her and told her not to ask the child another question concerning the child's life, that he had been very rude, and that the conversation had upset her.
According to Falgout, she had had conferences with other school employees regarding the mother's conduct, which included entering the classroom, being "pushy," and demanding things from Falgout. She testified that the mother had overruled her in the classroom with regard to the child, but she admitted that the mother's demands always had concerned what the mother considered to be in the child's welfare. Falgout stated that, at one conference she had conducted, the mother had told her that she wanted the child to call her husband "Daddy" and to call the father "Jay" and the child had confirmed that to her as well. Falgout testified that the child was open with her and had often told her that he loved the father. She stated that she considered the child and the father to be close and that, in her opinion, it would be detrimental to move the child away from the father. Falgout added that Ashford Academy, where the child had been attending school, was closing.
Doug Bauer, the headmaster of Ashford Academy from 2014 to 2015, testified that he had interacted with the mother and the child. He testified that, on one occasion, he had been involved in a confrontation with the mother at the school because she had wanted to pick up the child on the father's visitation day, which had resulted in the mother's contacting the police. According to Bauer, on several occasions, the mother had hidden in the teacher's lounge at the school so that she could check the child out of school after the father had dropped the child off at school. He stated that the mother had yelled and screamed at him on more than one occasion with regard to issues between her and the father. Bauer *430 stated that he did not have a very good relationship with the mother, but he had never had any problems with the father. Bauer testified that, on one occasion, the mother had advised him that she was going to take the child out of school and take him to Rhode Island and told Bauer not to tell the father. He stated that he had expressed his concern that the child was not doing well in school and that additional time in Rhode Island would be detrimental to the child, but the mother had indicated that she intended to move to Rhode Island with the child so it was a moot point. Bauer testified that the father had been very involved in the child's life. He stated that the mother had made attempts to catch the child up with regard to his grades after he had held a meeting about the mother's conduct. According to Bauer, the mother's husband had telephoned him telling him to "stay out of it" and had been abrasive to him, and, as a result, Bauer had hung up the telephone.
Jennifer Campbell, a child and family therapist who was the counselor at Ashford Academy during the 2014-2015 school year, testified as an expert. She stated that she had met with the child and had had counseling sessions with him throughout the school year. According to Campbell, the child had expressed that he loves the father. She stated that, in her opinion, moving the child to Auburn with the mother would be detrimental to the child because, she believed, the child had been used and brainwashed by the mother. Campbell testified that the things the mother tells the child to believe or say were confusing and hurting the child. She stated that the child needs to feel safe and secure and that he should be with the father for stability. According to Campbell, it was apparent to the child that he was being tugged back and forth, that the mother constantly talks badly about the father, and that the mother had been trying to play games and keep the child from the father. Campbell testified that the child had been very upset in the beginning of the school year because the mother had made it clear to the child that her husband would be his daddy rather than the father and because the mother would get very upset with the child if he failed to comply with the instruction to call her new husband "Daddy." She testified that the child had drawn a picture that showed the father off to the side and that the child had explained that he was going to be moving with his new daddy and his mommy far away from the father so that he would not be seeing the father anymore; she testified that the child's disclosures had been very alarming to her. She stated that she had seen repeatedly that the mother was trying to convince the child that the father is not the child's real father and that the father is a horrible person, which Campbell described as brainwashing. Campbell testified that the mother had told the child that the father is a bad person. Campbell stated that the mother's having taken a parenting class was a step in the right direction and that the parenting class the mother had participated in is a good program.
Louise Hughes, the child's paternal grandmother, testified that, in May 2015, she and her husband had attended the child's graduation at Ashford Academy and that the mother had used profanity toward her at the ceremony. Hughes stated that the mother's husband had approached her and had stated that, if she never spoke to the father, he might let her and her husband see the child a couple of times once the father goes to prison. Hughes testified that she had seen the mother hit the child because the child would not eat as fast as she wanted him to eat and that the mother had refused to allow her to pick up the child pursuant to the trial court's temporary *431 order. According to Hughes, the mother had yelled profanities at her in front of the child during a visitation swap. She testified that both the mother and her husband have bad tempers and that she did not feel safe with them having custody of the child.
Seth Brooks, an Assistant District Attorney for the 20th Judicial Circuit of Alabama, testified that he knows the father through cases he had been involved in, including a case involving a drug charge against the father that had been dismissed and a case regarding forfeiture of canines. Brooks stated that the drug charge against the father had been dismissed to expedite the proceedings involving the canines, both for economical reasons and for the safety and well-being of the canines. He testified that he had never looked at the evidence with regard to the dismissed drug charge, and, therefore, he did not have any personal knowledge as to whether there had been any drugs in the father's house. He testified, however, that he had filed a complaint with the Alabama Board of Private Investigators against the mother's husband and that criminal charges possibly could be brought against the mother's husband because he had misrepresented himself as a private investigator in an attempt to speak with Brooks about the drug case involving the father.
Jim Smith, the public-safety director at the Cottonwood Police Department, testified that he had participated in executing a search warrant at the father's residence pursuant to the father's arrest on June 16, 2015. He testified that the house had been full of dog feces and that the father had had several dogs living inside the house, including some that appeared to have been neglected. According to Smith, the father's house had been in disarray and he had found suspected controlled substances, although lab tests had not come back to confirm that at the time of the hearing. Smith testified that he had found firearms in the father's house where the child could reach them and that he had also found a "suppressor," or a silencer, which fit a gun found in the father's house. Smith stated that he had found glass pipes in the house, some of which contained burn marks and had been washed, and that those glass pipes would be classified as burn pipes for smoking drugs, commonly marijuana. He admitted that one could also smoke tobacco out of those devices. Smith testified that the dogs had been seized because of their emaciated condition and that the dogs remained in the custody of a rescue organization. According to Smith, at the time of the search, the father's house was not conducive to live in, but, after being shown current pictures of the father's house, he agreed that it would be safe for the child to live in.
The father testified that he had been arrested for possession of a controlled substance but that that charge had been dismissed with prejudice. He testified that his dogs had been taken from him but that the dogs had not been abused, that they had been taken care of, and that he loved the dogs. In regard to the glass pipes, he testified that he is a glass blower, that he makes the pipes, which are oil burners, that there were multiple oil burners in his house, and that he also makes ornaments and figurines. The father admitted that there had been accusations that he uses drugs, but he submitted to the court negative drug-test results dated January 16 and January 29, 2015.
The mother, who is Ukrainian, testified that her husband had been presented with an opportunity to run a business in Auburn where he would make good money. She testified that they had found a good private school for the child to attend and a good apartment complex to live in and that *432 she would agree to meet the father halfway between their residences for his visitation with the child. She stated that her parents intended to move to Auburn after she and the child moved there. The mother stated that she wanted the child to have visitation and a good relationship with the father and that she encouraged that relationship. She testified, however, that the father had not cooperated with her regarding visitation with the child and that he had made her go from place to place to pick up the child. The mother denied having yelled at the child at school and stated that she has a loud voice. With regard to the child's school field trip, the mother testified that her husband had had one can of beer on the field trip, that other parents had consumed alcohol on the trip, and that nobody had become intoxicated. The mother stated that she had not yelled at the paternal grandmother during the child's graduation ceremony. According to the mother, Falgout had lied about some things, including the mother's having verbally abused and yelled at the child during the child's graduation ceremony. The mother also denied having told the child to call her husband "Daddy."
The child's guardian ad litem stated at the hearing that he did not think it would serve the child's best interest to change custody at that time.
Standard of Review
" 'On appellate review of custody matters, [the appellate] court is limited when the evidence was presented ore tenus, and, in such circumstances, a trial court's determination will not be disturbed "absent an abuse of discretion or where it is shown to be plainly and palpably wrong." Alexander v. Alexander, 625 So.2d 433, 434 (Ala. Civ. App. 1993) (citing Benton v.Benton, [520 So.2d 534 (Ala. Civ. App. 1988) ] ). As the Alabama Supreme Court highlighted in [ Ex parte ] Patronas, [693 So.2d 473 (Ala. 1997) ], " '[T]he trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.' " Patronas, 693 So.2d at 474 (quoting Ex parte Bryowsky, 676 So.2d 1322, 1326 (Ala. 1996) ). Thus, appellate review of a judgment modifying custody when the evidence was presented ore tenus is limited to determining whether there was sufficient evidence to support the trial court's judgment. See Patronas, 693 So.2d at 475.
" ' "However, even under the ore tenus rule, '[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.' " B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala. Civ. App. 1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala. 1979) ).'
" Cheek v. Dyess, 1 So.3d 1025, 1029 (Ala. Civ. App. 2007). Moreover, the ore tenus rule does not apply to a trial court's legal conclusions. Ex parte Cater, 772 So.2d 1117, 1119 (Ala. 2000). Legal conclusions are subject to de novo review. Shealy v. Golden, 897 So.2d 268, 271 (Ala. 2004)."
R.D.R. v. C.R.P., 237 So.3d 873, 877-78 (Ala. Civ. App. 2016).
Analysis
The father argues on appeal that the trial court erred by ordering him to pay child support and by failing to order that the child attend private school as agreed upon by the parties. With regard to *433 child support, the divorce judgment, which incorporated the parties' agreement, provides, in pertinent part:
"The [father] shall not be ordered to pay child support by the guidelines, in the amount of $256.00. The [father] shall be responsible for all costs associated with private school to include but not limited to tuition, books, uniforms, fees, and lunches."
The father argues that, because he did not receive notice that the child-support provision of the divorce judgment might be modified, he was deprived of due process when the trial court ordered that he begin paying child support to the mother.
In State ex rel. Vickers v. Vickers, 684 So.2d 1327, 1329 (Ala. Civ. App. 1996), this court observed that, "[w]here there is no pleading, either written or oral, seeking modification of the amount of child support, and the issue is not tried by consent of the parties, expressly or impliedly, a judgment modifying the support order is due to be reversed." In the present case, the parties agreed that, in lieu of child support, the father would pay for the child's private-school expenses. The mother did not file a claim seeking a modification of child support in any written pleading submitted to the trial court. During the July 28, 2015, hearing, at which evidence was presented, when the issue of child support was broached, the father's attorney cited the child-support provision of the divorce judgment and the trial court stated that it was "not an issue." The trial court having expressly stated that the issue of child support was not being tried at that time, it cannot be said to have been tried by the parties' implied consent at that hearing. At the November 3, 2015, hearing, the father again argued that a modification of child support was not before the trial court. Because the issue of child support was not properly raised before the trial court and the father did not consent to the trial court's hearing that issue at any time, we agree that the trial court erred in modifying the terms of the divorce judgment by ordering the father to pay a monthly child-support amount. Accordingly, we reverse that portion of the trial court's judgment and remand the case for the entry of a judgment consistent with this court's opinion as to that issue.
The father next argues that the trial court erred by failing to allow him to present testimony at the November 3, 2015, hearing. He asserts that that failure violated his right to due process. Although the father sought to present testimony at that hearing, the father failed to argue to the trial court at any time that his due-process rights had been violated. "[An appellate court] cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992). Because the father failed to first present this argument to the trial court, we decline to address it for the first time on appeal.
The father next argues that the trial court erred by denying his November 9, 2014, motion indicating his intent to call witnesses and his request for the presence of a court reporter at the pendente lite hearing scheduled for November 10, 2014. Because the trial court's entry of a final judgment superseded the pendente lite order, which was interlocutory in nature, it rendered any issues concerning the propriety of the pendente lite order moot. F.M. v. B.S., 170 So.3d 663, 668 (Ala. Civ. App. 2014). The father argues, however, that, because he might seek further modifications of custody, including seeking pendente lite relief, in the future, this issue "falls within the exception to the doctrine of mootness." The father cites, among other *434 cases, McCoo v. State, 921 So.2d 450, 458 (Ala. 2005), in which our supreme court explained the "exception to the mootness doctrine in a situation where the controversy involves an important issue that is 'capable of repetition but evading review.' " (Quoting other cases.) In McCoo, our supreme court addressed an issue where the action of the trial court would effectively render the underlying issue moot because, according to the supreme court, it was empirically predictable that, if the issue in that case, which it described as "the waste of judicial time and resources caused by unnecessary remands," 921 So.2d at 459, was not addressed substantively, it would continue to burden the workload of trial courts and appellate courts, and, thus, the supreme court determined, it was appropriate to address the issue despite the entry of a final order in the case by the Court of Criminal Appeals.
In the present case, the father argues that, if this court does not address the issue regarding the pendente lite hearing, "the trial court will forever be allowed to deny the right of a court reporter to transcribe pendente lite proceedings at the last minute, and further, allow the trial court to forever deny the father due process of law by not allowing him to call witnesses in violation of [the law]." (Emphasis added.) The father fails, however, to cite any authority indicating that the issue in the present case falls within the exception outlined in McCoo. He asserts that, because he might seek to modify custody and to seek pendente lite relief in the future, the issue falls within the exception to mootness. We disagree. Unlike the issue in McCoo or those in the other cases cited by the father, which the appellate courts in those cases found were likely to be repeated, there is no certainty that the father, or any litigant, will request a court reporter and the transcription of pendente lite proceedings "at the last minute," as the father did in the present case or that the court would deny such a request. Because the issues surrounding the pendente lite proceedings were supplanted by the entry of a final judgment in this case, we decline to address this issue further.
The father next argues that the trial court erred by denying his right to make an offer of proof, on the record, after an objection was sustained by the trial court. At the November 3, 2015, hearing, the following exchange occurred during Campbell's testimony:
"Q. [By the father's attorney:] Did [the child] ever inform you that he was supposed to call [the mother's new husband], Daddy?
"A. Yes.
"[The mother's attorney]: Object. That's hearsay.
"The Court: Sustained.
"[The father's attorney]: Your Honor, may I respond to the hearsay objection?
"The Court: No. Because he, being the child-did the child inform you that he was supposed to call [the mother's current husband], Daddy. That's hearsay from the child. Objection sustained. Next question.
"[The father's attorney]: Your Honor, we would like to do a proffer for the record.
"The Court: Next question, or I move onto [the mother's attorney's] cross.
"[The father's attorney]: For the record, I'm not going to be able to do a proffer, Your Honor, to present my case?
"The Court: That's correct."
The father cites Ex parte Fields, 382 So.2d 598, 599 (Ala. 1980), in which our supreme court stated:
"As a general proposition, the party asking a question to which an objection *435 has been sustained must be given the opportunity to make an offer of proof stating the answer expected to be given. C. Gamble, McElroy's Alabama Evidence § 425.01(2) (3rd ed. 1977)."
In Walton v. Walton, 409 So.2d 858, 861 (Ala. Civ. App. 1982), this court observed the reason for that rule and an exception thereto:
"Generally, in order to preserve review of the trial court's ruling sustaining an objection to proffered evidence, the party offering the evidence must make an offer of proof indicating what the evidence would have shown. Cherry v. Hill, 283 Ala. 74, 214 So.2d 427 (1968). However, in situations in which the question disallowed indicates on its face the expected answer, no offer of proof is necessary to preserve error on appeal. Id."
In the present case, the question asked by the father's attorney-whether the child had informed the school counselor that he was supposed to call the mother's current husband "Daddy"-clearly indicates that the expected answer is "yes." Thus, this court could have reviewed the propriety of the trial court's ruling sustaining the objection without an offer of proof. Accordingly, any error by the trial court in denying the father the opportunity to make an offer of proof was harmless. See Rule 45, Ala. R. App. P. We therefore decline to reverse the trial court's judgment based on this issue.
The father next argues that the trial court erred in allowing testimony regarding his arrest and the subsequent dismissal of the drug charge against him into evidence over his objection. Citing Rule 609, Ala. R. Evid., which governs the admissibility of evidence for the purpose of attacking a witness's credibility, the father argues that, because he was not convicted of a crime, the evidence surrounding his arrest was inadmissible. We note, however, that there is no indication that the testimony elicited from Brooks and Smith was for the purpose of attacking the father's credibility. Thus, there has been no showing that Rule 609 is applicable. The father also cites Hereford v. State, 608 So.2d 439 (Ala. Crim. App. 1992), and Kaufman v. Kaufman, 934 So.2d 1073 (Ala. Civ. App. 2005), for the proposition that offers to settle or compromise are inadmissible. In Kaufman, this court concluded that the trial court in that case had erred in considering the parties' settlement negotiations in reaching its property-division and alimony awards in its judgment divorcing the parties. 934 So.2d at 1078-79. In Hereford, the Alabama Court of Criminal Appeals concluded that a statement by the defendant to a law-enforcement officer that the defendant would pay for the damage resulting from a structure that had burned was inadmissible. 608 So.2d at 443-47. In the present case, however, there is no testimony indicating that the father had made an offer to settle or compromise with regard to his arrest. Brooks's testimony indicating that a drug charge against the father had been dismissed did not indicate that the father had made an offer to settle with regard to that charge; rather, it indicated only that the authorities had made the decision to dismiss the charge. Accordingly, neither Kaufman or Hereford support the father's argument that the trial court erred by admitting the testimony of Brooks or Smith.
Rule 401, Ala. R. Evid., provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The mother argues in her brief to this court that the testimony referred to by the father is relevant to the issue of a proposed custody modification.
*436 The father has failed to respond to that argument or otherwise argue that the evidence at issue is irrelevant to the issues raised by the parties. Thus, that issue is waived. See Gary v. Crouch, 923 So.2d 1130, 1136 (Ala. Civ. App. 2005) ("[T]his court is confined in its review to addressing the arguments raised by the parties in their briefs on appeal; arguments not raised by the parties are waived.").
The father next argues that the trial court made a number of comments directed at the father's counsel in contravention of the Alabama Canons of Judicial Ethics. The father asserts that his counsel's failure to object to those statements was based on his concern that doing so would only worsen the situation. Although the father's concerns in that regard are understandable, this court may not address arguments that were not raised before the trial court. See Gary, supra. Accordingly, we decline to further address this issue.
We last address the father's argument that the trial court erred by denying the father's petition to modify custody and by allowing the mother to relocate with the parties' child. The father cites Ala. Code 1975, § 30-3-169.4, which provides:
"In proceedings under this article [i.e., the Alabama Parent-Child Relationship Protection Act, § 30-3-160 et seq., Ala. Code 1975 ] unless there has been a determination that the party objecting to the change of the principal residence of the child has been found to have committed domestic violence or child abuse, there shall be a rebuttable presumption that a change of principal residence of a child is not in the best interest of the child. The party seeking a change of principal residence of a child shall have the initial burden of proof on the issue. If that burden of proof is met, the burden of proof shifts to the non-relocating party."
The father also cites Ala. Code 1975, § 30-3-169.3, which provides, in pertinent part:
"(a) Upon the entry of a temporary order or upon final judgment permitting the change of principal residence of a child, a court may consider a proposed change of principal residence of a child as a factor to support a change of custody of the child. In determining whether a proposed or actual change of principal residence of a minor child should cause a change in custody of that child, a court shall take into account all factors affecting the child, including, but not limited to, the following:
"(1) The nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child's life.
"(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
"(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
"(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
"(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
*437 "(6) The preference of the child, taking into consideration the age and maturity of the child.
"(7) The degree to which a change or proposed change of the principal residence of the child will result in uprooting the child as compared to the degree to which a modification of the custody of the child will result in uprooting the child.
"(8) The extent to which custody and visitation rights have been allowed and exercised.
"(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
"(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.
"(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
"(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
"....
"(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
"(15) The reasons of each person for seeking or opposing a change of principal residence of a child.
"(16) Evidence relating to a history of domestic violence or child abuse.
"(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law.
"(b) The court making a determination of such issue shall enter an order granting the objection to the change or proposed change of principal residence of a child, denying the objection to the change or proposed change of principal residence of a child, or any other appropriate relief based upon the facts of the case."
The father argues that, based on the testimony presented, the factors in § 30-3-169.3 weigh heavily in favor of the father and that the trial court erred in allowing the mother to relocate to Auburn with the child. We agree with the father that much of the evidence presented would support a modification of custody, given the factors to be considered in light of the mother's relocation. We note also, however, that much of the evidence referenced by the father regarding the mother's behavior was refuted by the mother during her testimony. Evidence was also presented indicating that, at some point, the father's residence was in disarray, that the father had had a number of canines whose care the father had neglected, that the father's residence had contained dog feces, and that there were firearms inside the father's house that were kept within the child's reach. Although evidence was presented indicating that glass pipes, commonly used for smoking illegal substances, were found in the father's house, the father refuted that testimony. Additionally, although Smith, who provided much, if not all, of the negative testimony regarding *438 the father, indicated that a photograph depicting the father's residence showed that the residence would be safe for a child, the trial court could have considered the testimony regarding the previous state of the father's house and the safety concerns to the child resulting therefrom. The child's guardian ad litem also indicated to the trial court that a change in custody would not serve the child's best interest.
"We are not allowed to substitute our judgment for that of the trial court, even when this court might have reached a different result, unless the trial court's resolution of the facts is plainly and palpably wrong. L.R.M. v. D.M., 962 So.2d 864, 873-74 (Ala. Civ. App. 2007) (citing Griggs v. Griggs, 638 So.2d 916, 918-19 (Ala. Civ. App. 1994), quoting in turn Young v. Young, 376 So.2d 737, 739 (Ala. Civ. App. 1979) ). ' "[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow." ' Ex parte R.E.C., 899 So.2d 272, 279 (Ala. 2004) (quoting Ex parte Foley, 864 So.2d 1094, 1099 (Ala. 2003) ). When addressing the inability of an appellate court to reweigh the evidence and substitute its judgment for that of the trial court, our supreme court recognized:
" 'The trial court must be allowed to be the trial court; otherwise, we (appellate court judges and justices) risk going beyond the familiar surroundings of our appellate jurisdiction and into an area with which we are unfamiliar and for which we are ill-suited-factfinding.'
" Ex parte R.T.S., 771 So.2d 475, 477 (Ala. 2000)." J.B. v. Cleburne Cty. Dep't of Human Res., 992 So.2d 34, 39-40 (Ala. Civ. App. 2008). Because the trial court's judgment is supported by the evidence, we affirm that judgment with regard to its decision declining to modify custody and allowing the mother to relocate with the child to Auburn.
Conclusion
We reverse the trial court's judgment with regard to its modification of the child-support provision of the divorce judgment, and we remand the case for the entry of a judgment consistent with this opinion. With regard to the remaining issues raised on appeal, we affirm the trial court's judgment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Thompson, P.J., and Pittman and Thomas, JJ., concur.
Donaldson, J., concurs specially.
I concur. I write to observe that neither party discusses whether the evidence related to the filing of a criminal charge against the father was character evidence and whether the father's character was an essential element of a claim or defense in this custody litigation. See Rule 405(b), Ala. R. Evid.